Filed 9/27/19

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO NAVY BROADWAY COMPLEX COALITION,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CALIFORNIA COASTAL COMMISSION et al.,<br><br>Defendants and Appellants;<br><br>CITY OF SAN DIEGO,<br><br>Interveners and Appellants. | D072568<br><br><br><br>(San Diego Super. Ct.<br>Nos. 37-2013-00077213-CU-TT-CTL<br>and 37-2014-00006987-CU-TT-CTL) |

APPEALS from a judgment of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Affirmed.

Briggs Law Corporation, Cory Jay Briggs and Anthony N. Kim, for Plaintiff and Appellant San Diego Navy Broadway Complex Coalition.

Xavier Becerra, Attorney General, Daniel A. Olivas, Senior Assistant Attorney General, Jamee Jordan Patterson, Supervising Deputy Attorney General, for Defendant and Cross-Appellant California Coastal Commission.

Hogan Law, Michael M. Hogan for Defendant and Cross-Appellant San Diego Unified Port District.

San Diego City Attorney's Office, Mara W. Elliott, City Attorney, Glenn T. Spitzer and Michael Travis Phelps, Deputy City Attorneys, for Intervener and Cross-Appellant City of San Diego.

Latham & Watkins, Christopher W. Garrett, Taiga Takahashi and Daniel Brunton, for Intervener and Cross-Appellant One Park Boulevard, LLC.

INTRODUCTION

This appeal involves the proposed expansion of the San Diego Convention Center (Convention Center) by the City of San Diego and of the adjacent Hilton San Diego Bayfront hotel by One Park Boulevard, LLC (One Park, and collectively, the Project). The San Diego Unified Port District (Port) approved a port master plan amendment authorizing the Project (Amendment). The California Coastal Commission (Commission) certified the Amendment as consistent with the California Coastal Act (Pub. Resources Code, § 30000 et seq.),[1] which also required certain findings under the California Environment Quality Act (CEQA) (§ 21000 et seq.).

---

[1]  Subsequent statutory references are to the Public Resources Code, unless noted. We continue to refer to the code by name as appropriate for clarity.

San Diego Navy Broadway Complex Coalition (Navy Broadway) filed a petition for writ of administrative mandamus against the Commission and the Port to challenge the certification, later adding the City and One Park (collectively, Defendants).[2] Defendants asserted a statute of limitations defense, which the trial court rejected after a bench trial. The court then held a hearing on the merits, denied Navy Broadway's petition, and entered judgment for Defendants.

Navy Broadway appealed from the judgment, and Defendants filed a cross-appeal challenging the statute of limitations ruling. We conclude the trial court erred in rejecting Defendants' statute of limitations defense, the action should have been dismissed, and the judgment for Defendants should be affirmed. We also elect to address Navy Broadway's appeal and further conclude we could affirm based on the merits of its petition as well.

FACTUAL AND PROCEDURAL BACKGROUND

A.   *Background Facts*

The Convention Center is situated in downtown San Diego next to San Diego Bay. Following a Phase II expansion, the Convention Center occupied a contiguous 13-acre site, bounded by Harbor Drive (next to the Gaslamp Quarter district), Park Boulevard, and Convention Way on the southwest (bay) side. The Hilton is across Park Boulevard, along the bay.

---

[2]   The Port, City, and One Park filed joint briefs, and the Commission filed its own briefs. Unless specificity is necessary for context, we use "Defendants" when addressing arguments by any defendant.

The Port began considering a Phase III expansion of the Convention Center and a related expansion of nearby hotel facilities. In May 2012, the Port circulated the Amendment and a Draft Environmental Impact Report (Draft EIR) for public review and comment. In September 2012, the Port adopted resolutions certifying the Final Environmental Impact Report (Final EIR), approving the Amendment, and directing filing with the Commission for certification.[3] Port staff communicated with Commission staff and revised the Amendment based on their input. In October 2013, the Commission held a hearing on the Amendment and, after the Port agreed to additional changes, unanimously certified it as consistent with the Coastal Act. In February 2014, the Commission adopted revised findings supporting its October 2013 approval. The Port adopted the certified Amendment, and the Commission accepted the Port's adoption in June 2015.

As certified by the Commission, the Amendment provided for issuance of coastal development permits for the Convention Center and hotel expansions. The Convention Center expansion would be approximately 740,000 square feet, with around 15,000 square feet of visitor-serving uses along the southwestern façade.[4] Existing truck

---

[3]    Unless otherwise indicated, subsequent references to the EIR are to the Final EIR, "which is understood to include and incorporate the [Draft EIR] . . . ." (*Naraghi Lakes Neighborhood Preservation Assoc. v. City of Modesto* (2016) 1 Cal.App.5th 9, 15 fn. 3, citing Cal. Code Regs., tit. 14, § 15132.) We refer to the Draft EIR or Final EIR separately as needed.

[4]    The size of the expansion is not entirely clear. Many documents, including the EIR and Commission findings, refer to 740,000 square feet. But the Amendment states

4

operations on that side would be relocated.  A pedestrian accessway would be constructed inland of Convention Way, which itself would be shifted next to the Embarcadero Promenade along the waterfront.  An approximately five-acre rooftop park would be constructed, with a corresponding substantial reduction in ground level park areas.  The Hilton would also be expanded, adding a second tower and up to 500 new rooms.  Other changes included relocation of a water transit center; construction of a 1,900 square foot plaza; and opening an existing pier at the foot of Park Boulevard for recreational use.  An amended public access program would incorporate a plan for public realm design principles and programming and, among other things, provide for improved wayfinding, pedestrian amenities, and reports on rooftop utilization.

B.    *Procedural History*

In November 2013, Navy Broadway filed its petition for administrative mandamus against the Commission, the Port District, and Doe defendants.  It subsequently filed the operative first amended petition, alleging the Commission's approval of the Amendment violated the Coastal Act by, inter alia, certifying it as consistent with the Coastal Act and CEQA.  In 2014, Navy Broadway filed another petition, contesting the Commission's adoption of revised findings, which was consolidated with the first lawsuit.  Navy

---

the expansion will "add approximately 400,000 square feet of exhibit area, meeting rooms, and ballrooms, and approximately 560,000 square feet of support spaces."  Other sources (including a description elsewhere in the Commission findings) suggest that the expansion will exceed one million square feet.  In any event, there is no dispute the expansion would be at least 740,000 square feet.

5

Broadway later filed a third action after the Commission accepted the Port's approval of the certified Amendment, but this final petition was not consolidated with the first two.

In 2015, the City and One Park intervened, and Navy Broadway amended its petition to add them as defendants. Defendants contended the City and One Park were indispensable parties and Navy Broadway had failed to timely sue them. The trial court agreed they were indispensable, but found after a bench trial that Navy Broadway had been genuinely ignorant of them. Accordingly, it determined that the amendment related back, and that equitable tolling also applied.

In December 2016, the trial court held a hearing on the merits, after which it issued a statement of intended decision denying Navy Broadway's petition. The court decided that (i) the Amendment was not improperly modified after submission; (ii) the Commission did not err in finding the Convention Center expansion was not an appealable development under the Coastal Act; (iii) substantial evidence supported the Commission's findings under the Coastal Act; and (iv) the Commission did not err in making its CEQA findings. It overruled Navy Broadway's objections, adopted the statement of decision, and entered judgment for Defendants. After unsuccessful motions for new trial and to vacate the judgment, Navy Broadway appealed. Defendants cross-appealed based on the statute of limitations ruling.

DISCUSSION

A.      *Relevant Statutes and Standard of Review*

         1.      *The Coastal Act*

The Coastal Act is a " ' "comprehensive scheme to govern land use planning for the entire coastal zone of California." ' " (*San Diego Unified Port District v. California Coastal Commission* (2018) 27 Cal.App.5th 1111, 1129 (*SDUPD*).)  "Chapter 3 of the Act sets out coastal resources planning and management policies," which constitute standards for proposed development subject to the Coastal Act.  (*Id*. at p. 1130, citing § 30200.)  Chapter 8 "governs California ports and port district master plans."  (*Id*. at p. 1132, citing §§ 30700, 30711.)  The Commission has " 'primary responsibility for implementation' of the [Coastal] Act's provisions," and the " 'ultimate authority to ensure that coastal development conforms to the policies embodied in the . . . Coastal Act.' " (*SDUPD*, at p. 1130.)

As we later discuss in more detail, the Coastal Act requires that the Port "prepare and adopt a port master plan with public participation and submit it for certification by the Commission." (*SDUPD*, *supra*, 27 Cal.App.5th at p. 1132.)  After a public hearing, the Commission must certify the plan if it conforms with Chapter 8 and, where the plan provides for an appealable development, Chapter 3.  (§ 30714, subds. (a) and (b).)  Port master plan amendments are processed in the same manner.  (§ 30716, subd. (a).)

         2.      *CEQA*

In approving a port master plan or port master plan amendment, the Commission "shall make any findings required pursuant to the California Environmental Quality Act."

(Cal. Code Regs., tit. 14, § 13632, subd. (d).)[5]  "CEQA is a comprehensive scheme designed to provide long-term protection to the environment."  (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112; see generally Pub. Resources Code, § 21000 et seq. [CEQA].)  Agencies are required to make certain findings, including regarding mitigation, in deciding whether to approve projects.  (See *Cherry Valley Pass Acres & Neighbors v. City of Beaumont* (2010) 190 Cal.App.4th 316, 348 (*Cherry Valley*); Pub. Resources Code, § 21081.)

3.      *Standard of Review*

"Section 1094.5 of the Code of Civil Procedure governs judicial review by administrative mandate of any final decision or order rendered by an administrative agency."  (*Wences v. City of Los Angeles* (2009) 177 Cal.App.4th 305, 313.)  Review is for, among other things, whether "there was any prejudicial abuse of discretion."  (Code Civ. Proc., § 1094.5, subd. (b).)  An abuse of discretion is established if Commission "has not proceeded in a manner required by law, the . . . decision is not supported by the findings, or the findings are not supported by the evidence."  (*Ibid.*)

"Our scope of review is identical to that of the trial court.  [Citations.]  We, like the trial court, examine all relevant materials in the entire administrative record to determine whether the agency's decision is supported by substantial evidence."  (*Ross v. California Coastal Com.* (2011) 199 Cal.App.4th 900, 921 (*Ross*).)  " 'Although this task

---

5      Further citations to regulations are to the Coastal Commission's regulations, unless otherwise noted.  (Cal. Code Regs., tit. 14, § 13001 et seq.)  CEQA regulations are referred to as the CEQA Guidelines.  (Cal. Code Regs., tit. 14, § 15000 et seq.)

involves some weighing to fairly estimate the worth of the evidence, that limited weighing does not constitute independent review where the court substitutes its own findings and inferences for that of the Commission. Rather, it is for the [agency] to weigh the preponderance of conflicting evidence, as [the court] may reverse its decision only if, based on the evidence before it, a reasonable person could not have reached the conclusion reached by it.' " (*McAllister v. California Coastal Com.* (2008) 169 Cal.App.4th 912, 921 (*McAllister*).) The Commission's "findings and actions are presumed to be supported by substantial evidence," and Navy Broadway "bears the burden" to show otherwise. (*Ross*, at p. 921.)

B.      *Statute of Limitations*

Defendants contend the trial court erred in concluding the action was not time-barred based on a finding that Navy Broadway was genuinely ignorant of the City and One Park. Navy Broadway argues its claim did not accrue until the Amendment became effective, which was after it added the City and One Park. It maintains that previously it was genuinely ignorant of their involvement, and that its claims were equitably tolled. We conclude that the claim accrued when the Commission certified the Amendment, there is no substantial evidence of genuine ignorance (precluding equitable tolling as well), and the action should have been dismissed.

1.      *Additional Facts*

During the Amendment adoption and certification process, multiple documents identified the City and One Park as Project applicants. The Draft EIR indicated that the City proposed to expand the Convention Center, and that One Park proposed to build an

9

expansion hotel. The Final EIR identified the City and One Park as the Convention Center and hotel expansion applicants, respectively. Port Resolution 2012-135 (No. 135), which certified the EIR, stated that the Port was in discussions with One Park "to pursue entitlements to develop" the hotel expansion. The resolution also adopted the Port's Findings and Statement of Overriding Considerations and directed filing of the CEQA Notice of Determination; each of these documents identified the City and One Park as the project applicants. Port Resolution 2012-136 (No. 136), which approved the Amendment and directed it be filed for certification, did so as well. The agenda for the September 2012 Port hearing at which the resolutions were adopted reflected that the City was pursuing entitlements for the Convention Center and One Park was discussing them for the expansion hotel. Finally, the Amendment itself provided for issuance of coastal development permits, and specifically mentioned issuance of a permit to the City.

In advance of the October 2013 certification hearing, Navy Broadway's attorney Corey Briggs submitted a letter opposing the Project on the organization's behalf. The letter contained a "List of Problems," which referenced exhibits on an enclosed list. The exhibit list named the Draft EIR, Final EIR, Port Resolution No. 135, and the Port agenda. The exhibits themselves included these materials, as well as the Notice of Determination and Statement of Overriding Considerations.[6]

---

[6] The trial court identified *still other* documents in the administrative record that identified the City, such as Port Resolution No. 2014-56 (adopting the Amendment as certified).

10

As previously noted, Navy Broadway filed its petition commencing this action in November 2013. In Paragraph 3, Navy Broadway alleged that the Port was a public agency created by the state legislature, and that "[i]n general, the Port was the proponent of the project that is the subject of this lawsuit when the project was presented to the Coastal Commission for approval." In Paragraph 5, Navy Broadway alleged that the Port adopted Resolution No. 135 certifying the EIR and Resolution No. 136 approving the Amendment, noting the Amendment allowed for issuance of coastal development permits for the Convention Center and hotel expansions. The petition referenced the EIR elsewhere as well. It sought, among other things, injunctive relief barring issuance of any coastal development permit under the Amendment.

In the Commission's answer, it admitted the allegations of Paragraph 3. The Port denied Paragraph 3, except for the fact that it was a public agency created by the legislature.

In February 2015, the City and One Park filed complaints in intervention. Navy Broadway amended its petition to identify them as the Doe defendants. Defendants demurred and moved to dismiss on statute-of-limitations grounds based on Navy Broadway's delay in naming them. The trial court determined that (1) the City and One Park were indispensable parties; (2) the "action must be dismissed if they cannot be joined"; and (3) whether Navy Broadway had been genuinely ignorant of them was a factual question for an evidentiary hearing.

To address issue (3), the trial court conducted a bench trial. Testifying witnesses included Don Wood and Diane Coombs of Navy Broadway and Darren Greenhalgh from

11

the City.  The court also heard portions of the March 2016 deposition testimony by Todd

Hersperger of One Park.[7]

Coombs and Wood were Navy Broadway board members.  Both attended Port

hearings at which City efforts to fund the Convention Center expansion were addressed,

and Wood provided input on the Project (including comments to the EIR that criticized

City actions).  According to Coombs, Navy Broadway authorized Briggs to file the

opposition letter, but she did not contribute to it and relied on Briggs to review the

exhibits.  Wood consulted on the letter's "List of Problems," and had looked at and

provided some of the exhibits.  Coombs and Wood reviewed the agendas for the October

2013 and February 2014 Commission hearings, and there was no reference to the City or

One Park.  Wood indicated that Navy Broadway initiated the lawsuit, he was involved in

preparing the petition, and Briggs managed the litigation.

Darren Greenhalgh was a City employee, and his office participated in preparing

the Port's application to certify the Amendment.  He considered the City to be a joint

proponent of the application, but acknowledged it only identified the Port as the

proponent.  He did not know of any City communication identifying the City as a

proponent, or recall City materials in support besides a letter from the mayor.  He learned

---

[7]     Navy Broadway seeks to lodge the Hersperger deposition transcript.  Defendants
oppose lodging because the deposition was not admitted into evidence, but they provide a
redacted transcript of the parts read at trial.  We consider the redacted transcript.  We also
note the trial court indicated in its statement of decision that it questioned the witnesses'
bias and memory, and that it "accepted the part it perceive[d] to be true," but did not
make express credibility determinations.

about the lawsuit shortly after the certification hearing, and had not heard of Navy Broadway before then.

Todd Hersperger worked for Sunstone Hotel Investors, which was a majority owner of One Park, the entity that owned the bayfront Hilton (with Hilton owning the rest). He was not involved in the Amendment process. He indicated One Park found out about the lawsuit in late November 2013, and did not know when it learned about the 2014 action. Hersperger was not aware of Navy Broadway until a week or two before his deposition.

The parties made stipulations pertinent to equitable tolling. The City stipulated it was aware of Navy Broadway's lawsuits when they were filed. The City and One Park agreed to waive the issue of unreasonable delay, meaning they would not be addressing prejudice.

The trial court provided a statement of decision in which it concluded that Navy Broadway's action was timely. First, the court found that Navy Broadway was genuinely ignorant of the City and One Park, and that its amendments naming them related back to its original petition. The court listed documents identifying the City and One Park, and acknowledged the evidence was "impressive." It stated that "[i]f this were the full extent of the evidence," it "would be inclined to find that Plaintiff was not 'genuinely ignorant' . . . . " It continued, "[H]owever, the question, on which the Court has reflected most, is whether Defendants' theory is undermined by [the Commission]'s admission that [the Port] was . . . 'the proponent of the project . . . .' " The court cited authority holding parties should not be relieved from the effect of judicial admissions. It elaborated:

13

"If [the Commission], which was in a superior position to review and certify the 'project,' considered [the Port] to be the 'proponent' of the 'project,' why should Plaintiff have thought differently? [¶] The Court cannot reconcile [the Commission's] judicial admission with Defendants' theory that Plaintiff was not 'genuinely ignorant' . . . ."

The court also noted that the Commission's admission was "consistent with Greenhalgh's testimony" that the certification application "only identified [the Port] as the project's proponent."

Next, the court found that the statute of limitations was also equitably tolled. As we later discuss, equitable tolling requires timely notice to the defendant; lack of prejudice; and good faith and reasonable conduct by the plaintiff. The court noted that Defendants did not contest the first two elements. Citing Defendants' position that the third element " 'overlap[ped], in great part if not completely' " with the genuine ignorance issue, the court stated: "Once again, Defendants' arguments . . . that [Navy Broadway's] failure to name City and One Park was not precipitated by 'good faith and reasonable conduct,' are impressive; however, like above, the Court cannot reconcile [the Commission's] admission with Defendants' theory."

Finally, the court denied the City's request for judicial notice of briefs filed by Briggs for a different client in another action. Defendants filed objections to the statement of decision, which the court overruled.

2.      *Accrual of Navy Broadway's Claim*

Navy Broadway disagrees that its claim accrued when the Commission certified the Amendment in October 2013. Rather, it contends, the statute of limitation began to

14

run in June 2015 when the Amendment became effective; that is, when the Commission accepted the Port District's resolution adopting the certified Amendment. We disagree.

Section 30801 provides the applicable statute of limitations. Under that section, any "aggrieved person shall have a right to judicial review of any decision or action by filing a petition for writ of mandate in accordance with section 1094.5 of the Code of Civil Procedure, within 60 days after the decision or action has become final." (§ 30801.) Where, as here, "the underlying facts are not in dispute . . . , the question of when a cause of action accrues is a question of law, subject to independent review." (*Pacific Shores Property Owners Assn. v. Department of Fish & Wildlife* (2016) 244 Cal.App.4th 12, 34.) As we shall explain, the certification decision is final once made.

"In cases involving statutory interpretation, our ' " 'fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose.' " [Citation.] " 'If the statute's text evinces an unmistakable plain meaning, we need go no further.' " [Citation.]' [Citation.] 'We construe statutory language in the context of the statutory framework, seeking to discern the statute's underlying purpose and to harmonize its different components.' " (*Connor v. First Student*, *Inc.* (2018) 5 Cal.5th 1026, 1035; see *Murphy v. Kenneth Cole Productions*, *Inc.* (2007) 40 Cal.4th 1094, 1103 ["[W]hen the statute's language is ambiguous or susceptible of more than one reasonable interpretation, [the court may] turn to extrinsic aids to assist in interpretation."].)

Section 30801 does not define "final." However, its definition of "aggrieved person" reflects a focus on particular Commission decisions, not events that may follow such decisions. (*Ibid.* ["[A]n 'aggrieved person' means any person who . . . appeared at a

15

public hearing . . . in connection with the decision or action appealed, or who, by other appropriate means . . . , informed the commission, local government, or port governing body of the nature of his concerns"]; see *ibid.* [" 'Aggrieved person' includes the applicant for a permit and, in the case of an approval of a local coastal program, the local government involved.' "].)  Thus, focusing on the certification decision is consistent with the statutory text.  Authority from the port context is sparse, but other Coastal Act case law reflects this focus on Commission rulings, and not subsequent events.  (See *Strother v. California Coastal Com.* (2009) 173 Cal.App.4th 873, 878 [§ 30801's 60-day period "generally bars untimely efforts to challenge coastal commission *rulings.*"  (Italics added.)]; cf. *Ojavan Investors*, *Inc. v. California Coastal Com.* (1994) 26 Cal.App.4th 516, 525 [time "to challenge coastal development permits . . . is within the statutory 60-day period after issuance of the permits . . . , not when a party . . . elects to violate Declarations of Restrictions imposed pursuant to the permits, and a cease and desist order ensues"].)

Viewing the certification decision as final when made is also consistent with the larger statutory scheme, which provides no mechanism for the Commission to change its certification decision.  (See *Oxnard Shores v. California Coastal Com.* (1986) 179 Cal.App.3d 140, 149 [acknowledging principle that agency "may not change a determination made on the facts presented at a full hearing once its decision has become final" absent statutory authority, while concluding Commission could comply with alternative writ].)  The Commission may provide revised findings, as it did here, but the findings do not change the certification.  Indeed, the Commission's notice for its February

16

2014 hearing to approve its revised findings stated, "Adoption of these findings will not change the previous action."[8]

Finally, requiring parties to promptly contest certification decisions ensures timely and final resolution of such challenges, consistent with other proceedings under the Coastal Act and involving land use. (See *Sierra Club*, *Inc. v. California Coastal Commission* (1979) 95 Cal.App.3d 495, 503 (*Sierra Club*) [once developer has complied with the Coastal Act and obtained a permit, it "should not be required to postpone construction for prolonged periods of time while awaiting the commencement of litigation"]; *Stockton Citizens for Sensible Planning v. City of Stockton* (2010) 48 Cal.4th 481, 499 ["To ensure finality and predictability in public land use planning decisions, statutes of limitations governing challenges to such decisions are typically short. [Citations.] The limitations periods set forth in CEQA adhere to this pattern . . . ."].)

Navy Broadway urges us to focus on the Amendment's effective date. It explains that certification is not effective until additional steps are taken. (Cal. Code Regs., tit. 14, § 13632, subd. (e) [plan certification "shall not become effective until the port governing

---

8     Guidance in other Coastal Act settings is again instructive, and illustrates revised findings are meant to capture actions, not change them. (See, e.g., Cal. Code Regs., tit. 14, § 13096, subd. (b) [if Commission action on coastal development permit substantially differs from staff report, staff prepares "revised staff report with proposed revised findings that reflect the action"], *id.*, subd. (c) [hearing "shall solely address whether the proposed revised findings reflect the action"]; *La Costa Beach Homeowners' Assn. v. California Coastal Commission* (2002) 101 Cal.App.4th 804, 819 [disagreeing with the contention that revised findings on mitigation parcel were "post hoc rationalizations"; they "did nothing more than reflect in writing the rationale that the Commissioners and staff articulated on the record at the . . . public hearing"].)

17

body takes formal action adopting such plan as certified by the commission . . . and the commission has accepted the formal action as consistent with its certification"]; § 13636 [accord; amendment certification].) It contends the Amendment "was not fully certified – nor was it 'final' " until the Commission accepted the Port District's adoption, citing a Port agenda referencing the Amendment being "fully certified" in this manner. And it argues that the Amendment "could not have been fully certified" in October 2013, because "the Port had not even made the necessary findings on the modified [Amendment]" and certain changes required an addendum to the EIR.

All of these arguments are misguided. This lawsuit challenges the Commission's *certification* decision, not the subsequent implementation of that decision, by the Port or otherwise.[9] And the Port's use of the phrase "fully certified" does not support the existence of some later, truly final decision. The term is not in the statute or regulations; the context suggests the Port was using it to mean "effective"; and there is nothing to suggest the Port—or, more importantly, the Commission—viewed the certification decision as subject to change.

Navy Broadway also seeks to rely on *Save Our NTC*, *Inc. v. City of San Diego* (2003) 105 Cal.App.4th 285, but the case is inapposite. A petitioner challenged the City's adoption of zoning ordinances that implicated Commission approval. (*Id.* at p. 290.) The Commission had given its approval subject to modifications, which the City adopted. (*Id.*

---

9     The lawsuit encompassing the Commission's acceptance of the Port's approval -- Navy Broadway's third petition -- was not consolidated with this one.

18

at pp. 290–291.) We determined that the action was timely under Government Code section 65009, subdivision (c)(1)(B)'s 90-day statute of limitations for zoning ordinance decisions. (*Save Our NTC*, at p. 291.) Citing case law holding that such challenges run from ordinance effective date, we explained the ordinances did not take effect, and the statute of limitations did not begin to run, until the City adopted the Commission's modifications. (*Id.* at p. 293.) Navy Broadway is challenging a Commission certification decision, not a zoning ordinance subject to Commission approval.[10]

3.    *Genuine Ignorance*

We now turn to the central issue here: whether the trial court erred in finding Navy Broadway was genuinely ignorant of the City and One Park? We believe it did.

Code of Civil Procedure section 474 provides that "[w]hen the plaintiff is ignorant of the name of a defendant, he must state that fact in the complaint, . . . and such defendant may be designated in any pleading or proceeding by any name, and when his true name is discovered, the pleading or proceeding must be amended accordingly . . . ." "The phrase 'ignorant of the name of a defendant' is broadly interpreted to mean not only ignorant of the defendant's identity, but also ignorant of the facts giving rise to a cause of action against that defendant." (*Fuller v. Tucker* (2000) 84 Cal.App.4th 1163, 1170

_____

[10]    We note there is conflicting authority, even in the zoning context. (Compare, e.g., *Howard Jarvis Taxpayers Assn. v. City of Los Angeles* (2000) 79 Cal.App.4th 242, 247 [zoning ordinance; action to be brought within 90 days of effective date], disapproved on other grounds in *Ardon v. City of Los Angeles* (2011) 52 Cal.4th 241, 250, with *Beresford Neighborhood Assn. v. City of San Mateo* (1989) 207 Cal.App.3d 1180, 1187 (*Beresford*) [zoning amendment decision occurred when ordinance was adopted].)

(*Fuller*); see *McClatchy v. Coblentz, Patch, Duffy & Bass, LLP* (2016) 247 Cal.App.4th 368, 371–372 [accord].) " '[T]he relevant inquiry when the plaintiff seeks to substitute a real defendant for one sued fictitiously is what facts the plaintiff actually knew at the time the original complaint was filed.' " (*Fuller*, at p. 1170.)

The trial court's conclusion that Defendants did not establish their statute-of-limitations defense rests upon its factual finding that Navy Broadway was genuinely ignorant of the City's and One Park's involvement. We review this finding for substantial evidence. (*Fuller*, *supra*, 84 Cal.App.4th at p. 1170 [factual findings under Code Civ. Proc., § 474 are reviewed for substantial evidence].)

As a preliminary matter, we address the trial court's apparent reliance on the admission of one defendant. If the trial court relied on the Commission's admission to effectively find that *all* defendants waived the genuine ignorance issue, this could be problematic. (See *Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 48 ["A judicial admission is *a party's* unequivocal concession" (italics added)]; *Valerio v. Andrew Youngquist Construction* (2002) 103 Cal.App.4th 1264, 1271 [" '*a pleader* is bound by . . . failure to deny well pleaded material allegations' " (italics added)].) But it is not clear it did so. The court did refer to the Commission's admission as a judicial admission, "reflected most" on whether it undermined Defendants' theory, and cited authority holding that parties should not be relieved of judicial admissions. However, it also treated the admission as evidence, by explaining its significance (i.e., the Commission was in a superior position to review the Project) and stating it was consistent with Greenhalgh's testimony. Ultimately, we need not decide if the trial court erred here,

because even under substantial evidence review we would conclude that there is no support for its genuine ignorance finding.

In general, a developer is an indispensable party to a lawsuit challenging a decision regarding whether its project can proceed. (See *Sierra Club*, *supra*, 95 Cal.App.3d at p. 502 [developer was indispensable for challenge to Commission decision regarding condominium project].) The trial court found that the City and One Park were indispensable parties. Navy Broadway does not dispute that finding; rather, its position is that it was unaware of the City's role and of One Park altogether. The record, however, is to the contrary.

At the time Navy Broadway filed suit, it possessed information reflecting that the City and One Park were the developers for the Project. The Amendment indicated that coastal development permits would be issued and the City would be receiving one. Coombs and Wood participated in the planning process and witnessed and/or commented on the City's involvement. Multiple documents identified the City and One Park, and/or their anticipated roles as the project developers, including the EIR and the 2012 Port resolutions. Navy Broadway attached some of those documents to its opposition letter, which Coombs testified Navy Broadway authorized and to which Wood contributed. Navy Broadway's petition (which Wood testified he was involved in preparing) referenced the EIR and Port resolutions, and expressly sought to block issuance of the coastal development permits. Finally, the Port denied the allegation that it was the Project proponent, raising questions about the Commission's admission and warranting further inquiry.

21

On this record, no reasonable trier of fact could find Navy Broadway was genuinely ignorant of the City and One Park and their roles here. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633 ["ultimate determination" in substantial evidence review is "whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record"].) The trial court acknowledged Defendants' evidence of Navy Broadway's awareness was "impressive," before citing the Commission's admission in ruling against them. Even if the Commission could be viewed as admitting the Port was the only proponent for the Project (not simply *a* Project proponent or, as Defendants characterize it here, the Amendment proponent), that does not establish that Navy Broadway was genuinely ignorant of the City and One Park and their roles as developers here.

*Beresford*, which involved a challenge to a housing development, is instructive. The operative complaint included city council minutes that disclosed the developer, but named only the city and fictitious defendants. (*Beresford*, *supra*, 207 Cal.App.3d at p. 1185.) The trial court sustained the city's demurrer. (*Ibid.*) The Court of Appeal affirmed and held it was too late to amend, explaining that "[s]ince appellants were not ignorant of the developer's true name, they cannot take advantage of Code of Civil Procedure section 474." (*Id.* at pp. 1185, 1190.)

Navy Broadway argues that *Beresford* is distinguishable because the minutes were attached to the complaint. But the complaint in this case similarly cites documents identifying the developers (e.g., the EIR). *Beresford* was also decided on demurrer, so the court only had the complaint. Here, there was a bench trial at which the court

22

received other evidence regarding Navy Broadway's knowledge. Navy Broadway also notes that the *Beresford* plaintiff signed the complaint there, while its counsel signed the petition here. We agree with Defendants that this is irrelevant (see *Knapp v. Doherty* (2004) 123 Cal.App.4th 76, 95 [plaintiff in foreclosure matter had imputed knowledge through counsel]), and, again, there was other evidence of knowledge.

Navy Broadway maintains that it was ignorant of the City's role, and knew only that it was providing financial assistance, and that it was unaware of One Park. It cites the witness testimony and lack of references in the Commission agendas (contending "[t]here was no reason for [Coombs] to probe further"). We recognize that Coombs and Wood stated they did not see the City or One Park's names in the Commission agendas, and that Greenhalgh testified he was unaware of communications identifying the City as an applicant. But this does not undermine the relevance of the documents that *did* identify the City and One Park. Navy Broadway also emphasizes that Greenhalgh and Hersperger were ignorant of Navy Broadway prior to the lawsuit, but we fail to see the significance. Navy Broadway could be aware of the City and One Park, without those entities being aware of it. Finally, given the absence of substantial evidence of ignorance, we reject Navy Broadway's reliance on *Hollister Canning Company v. Superior Court* (1972) 26 Cal. App. 3d 186 (*Hollister*). (See *id*. at p. 198 [plaintiff was unaware of defendant's role in installing allegedly defective equipment].)[11]

---

[11]  Navy Broadway also suggests *Hollister* permits relation back where the defendant is aware of the lawsuit, "but stays silent to avoid liability." *Hollister* noted the

23

### 4.    *Equitable Tolling*

Defendants also contend the trial court erred in ruling that equitable tolling barred their statute of limitations defense. This ruling turned on the unsupported genuine ignorance finding, and is deficient for the same reasons.

The doctrine of equitable tolling is used to " 'suspend or extend a statute of limitations as necessary to ensure fundamental practicality and fairness.' " (*McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 99.) The "three core elements are:  (1) timely notice to the defendant in filing the first claim; (2) lack of prejudice to defendant in gathering evidence to defend against the second claim; and, (3) good faith and reasonable conduct by the plaintiff in filing the second claim." (*Collier v. City of Pasadena* (1983) 142 Cal.App.3d 917, 924.)

The trial court concluded that equitable tolling should apply because the parties stipulated on notice and prejudice, the good faith issue overlapped with the genuine ignorance issue, and it already determined Navy Broadway was not genuinely ignorant. As already discussed, there is insufficient evidence that Navy Broadway was genuinely

---

defendant's awareness only *after* finding the plaintiff lacked knowledge. (*Hollister*, *supra*, 26 Cal.App.3d at p. 198; see *Woo v. Superior Court* (1999) 75 Cal.App.4th 169, 177 [if ignorance requirement is not met, a new defendant may not be added "even if [it] cannot establish prejudice resulting from the delay"].)

ignorant. Thus, there is a lack of evidence to support the good faith finding, and the equitable tolling ruling was in error. We need not address the other two elements.[12]

In conclusion, Defendants' statute of limitations defense was meritorious, and required dismissal.[13] We affirm the judgment in favor of Defendants on these grounds.

C.    *Certification of the Amendment*

Although we do not need to reach Navy Broadway's appeal from the judgment, having already concluded it should be affirmed, we elect to do so in the interests of completeness and finality. Navy Broadway argues that the Commission committed a number of errors including: (1) improperly negotiating changes to the Amendment; (2) determining that the Convention Center expansion was not appealable (meaning it would not have to conform to Chapter 3 of the Coastal Act); (3) failing to make certain Coastal Act findings and lacking evidence for others; and (4) providing deficient findings regarding CEQA. In our view, Navy Broadway does not establish reversible error on any of these grounds.

---

[12]    We recognize that Defendants dispute there was a stipulation on notice, and that the notice element for equitable tolling could even be satisfied here. Because we do not need to reach the notice issue, we do not address these matters.

[13]    In light of our conclusion, we need not address Defendants' additional argument that the trial court erred in excluding briefs from another action involving the Project's financing in which Briggs represented a different client, introduced to show that Briggs (and thus Navy Broadway) knew the City was a project applicant. That action eventually culminated here in *City of San Diego v. Shapiro* (2014) 228 Cal.App.4th 756 (*Shapiro*). Given we do not reach this argument, we deny Navy Broadway's request for judicial notice of the trial court's ruling and our decision in *Shapiro*. We do address *Shapiro* in connection with Navy Broadway's CEQA arguments.

### 1.    *Changes to the Amendment*

Navy Broadway argues that the Commission violated Public Resources Code section 30714's bar on conditional approval by negotiating changes to the Amendment after its submission.  It further contends that regulation section 13634, which addresses postsubmission changes, is inconsistent with the Coastal Act and was not, in any event, satisfied here.  We reject each contention.

#### a.    *Additional Facts*

In May 2012, the Port circulated the Amendment for public review and comment. The Port's board of commissioners adopted the Amendment in September 2012.

In December 2012, Port staff member Lesley Nishihira, as Manager of Land Use Planning for the Port, submitted the Amendment to Commission staff member Sherilyn Sarb.[14]  Another member of Commission staff, Deborah Lee, communicated that the Amendment did not reflect the current port master plan (which had been amended in November 2012) and that the exhibits included a new pedestrian bridge that was no longer part of the project.  Nishihira transmitted the corrected Amendment and exhibits. The Port later withdrew the Amendment in February 2013 and resubmitted it the following month.

In March 2013, Lee sent a letter to Nishihira identifying issues on which Commission staff needed additional information.  Nishihira provided responses in July 2013.  Additional communications followed between Nishihira; Commission staff;

---

[14]    We omit certain staff member titles for clarity, and intend no disrespect.

26

Stephen Cushman, a special assistant to the mayor and former Port commissioner; and Charles Lester, executive director of the Commission. On September 26, 2013, Cushman e-mailed Sarb and Lester, copying Port Commissioner Ann Moore, with the subject line, "Final." He indicated that as an alternative to a pedestrian bridge, the Port could require the City to allocate $500,000 for measures to activate the rooftop. Sarb responded, stating:

> "Attached is the latest proposal from CCC staff with your language . . . incorporated. We believe if this language, along with the revision to the bldg. (the notch) and all the other changes . . . that have been agreed to by Port staff are incorporated into the . . . amendment request, CCC staff could recommend approval. . . . Can you pls let us know asap . . . if the Port will modify its request and incorporate all of the above?"

The notch appeared to refer to the pulling back and angling of a corner of the Convention Center expansion.[15] It is not clear if there was a response.

The next day, Commission staff issued its report and recommended denial of certification. It explained: "Commission staff and Port staff have worked to make revisions to the project . . . . Unfortunately, there are two key elements—construction of a pedestrian bridge at 4th Avenue, and revisions to the . . . corner of the Convention Center expansion, where Port and Commission staff were unable to reach agreement . . . ." The Commission's notice for the upcoming certification hearing included information on how to request a copy of the staff report.

---

[15] Various documents, including the Commission findings, state this is the southwest corner, but others (including an addendum to the Final EIR) indicate it is the southeast corner. The relevance is that the size was reduced, and we simply refer to it as a corner.

There were further communications over the next two weeks. On September 29, Cushman e-mailed Lester, Sarb, and Moore, indicating Moore was going back to the Port board. On October 6, Cushman e-mailed the same group using the subject line "Final Document," agreeing to the notch and providing language for the Amendment that would require future reports to the Commission on rooftop utilization and related matters (hereafter, "rooftop utilization reports"). On October 7, Nishihira transmitted a revised Amendment to Commission staff member Diana Lilly, with a cover page indicating it "includes [the] 'notch.' " In a separate letter, Nishihira indicated they were unable to reach resolution on the pedestrian bridge, but the Port would agree to the proposed language on rooftop utilization reports.

On the following day, Commission staff issued an addendum to their staff report, indicating the Port's amendments were noteworthy, but insufficient. The addendum included as exhibits the October 7 version of the Amendment and Nishihira's letter with the rooftop utilization reports language. The Amendment referenced the Convention Center and South Embarcadero public access programs, and those documents similarly reflected postsubmission revision dates.

As discussed, Navy Broadway provided an opposition letter. Dated October 10, this letter challenged various aspects of the Project and objected to the modification of the Amendment.

The certification hearing also took place on October 10. Numerous people spoke, including elected officials, organization leaders, union representatives, employees, and residents. Briggs opposed the project on behalf of Navy Broadway and noted the

28

postsubmission modifications.  Nishihira addressed the issue, stating the changes were "clearly documented in the public record" and "[t]he public has had a chance to review and consider those changes and some have commented today."  At the end of the hearing, Sarb requested clarification on the proposed rooftop utilization reports language and the $500,000 for public access improvements.  Nishihira and Cushman expressed agreement, and Nishihira stated, "We amend our proposal."  Briggs stated, "[M]ay I make an objection since you're changing things?"  The chair stated no, indicating it did not fit with their procedures.  The Commission then voted unanimously to certify the Amendment.

In November 2013, Nishihira transmitted a final revised Amendment, dated October 10, to Lilly.  The Convention Center public access program was also revised effective October 10.  Commission staff prepared revised findings, and the Commission adopted them at a hearing in February 2014.  The Commission summarized the revisions, including those at the hearing.  It found they "either were not material, in that they further enhanced the [Amendment]'s consistency with Coastal Act policies, or were made available for public review through the published addendum in advance of the hearing and were the subject of adequate public comment at the public hearing."

b.    *Applicable Law*

In order to amend the port master plan, the Port's governing body must hold a public hearing, adopt the amendment, and submit it to the Commission for certification.  (Pub. Resources Code, §§ 30712, 30714; see Cal. Code Regs., tit. 14, §§ 13626–13628, 13636 [accord].)  A regulation addresses postsubmission modification:

29

"If the governing body of a port amends its master plan [or amendment] after submission . . . and prior to the . . . calling of the roll for a vote . . . , the executive director [of the Commission] shall determine if such amendment is material and includes changes that have not been the subject of public review and comment before the Commission. If the executive director finds that both of these factors exist, the amendment shall not be considered by the Commission unless a new public hearing is scheduled with a view toward allowing full public participation and attendance at the hearing on the amendment . . . . If the executive director finds the amendment is not material or has been the subject of adequate public comment at the public hearing, the Commission, unless it disagrees with the findings of the executive director, shall consider and take action on the amendment rather than the master plan [or amendment] as initially submitted." (Cal. Code Regs., tit. 14, § 13634.)

Section 30714 provides that the Commission, "after public hearing, shall certify the plan or portion of a plan and reject any portion of a plan which is not certified. The commission may not modify the plan as submitted as a condition of certification." (*Ibid*.)

c.    *Analysis*

Navy Broadway first contends that the Commission improperly obtained changes to the Amendment in violation of section 30714, arguing that it could vote only on the "original" version of the Amendment and that "negotiations at the Commission" are prohibited. Navy Broadway does not establish the Commission's actions were in error.

On its face, section 30714 only bars the Commission from *requiring* a modification in order to grant approval. It imposes no limitation on other Commission action, or on Port action at all. Thus, in *SDUPD*, *supra*, 27 Cal.App.5th 1111, the trial court concluded that the Commission violated section 30714 by finding the Port had to provide lower cost accommodations and identifying suitable developments. We reversed, observing that this conclusion was "based on an impermissibly broad reading of the limit

30

placed on [the] Commission in section 30714." (*Id.* at p. 1140.) Explaining that the statutory limitation must be "[s]trictly construed," we held that "section 30714 prohibits Commission only from *conditionally approving* a master plan, that is, granting certification subject to a specified modification." (*Ibid.*) Here, Commission and Port staff communicated about changes, and the Port modified the Amendment prior to the certification vote (while still declining to incorporate the new bridge). The Commission did not conditionally certify the Amendment, and thus did not violate section 30714.[16]

Second, Navy Broadway does not establish that regulation section 13634 conflicts with Public Resources Code section 30714, or that the Commission exceeded its authority in adopting it. Public Resources Code section 30333 "authorizes the Commission to adopt 'rules and regulations' to 'carry out the purposes' of the Coastal Act . . . ." (*Trancas Property Owners Ass'n v. City of Malibu* (1998) 61 Cal.App.4th 1058, 1061–1062, fn. 2.) Section 30714 prohibits only conditional approval. Regulation section 13634 addresses review of postsubmission changes prior to the Commission's decision (requiring further review for material, nonpublic changes). It thus presents no conflict and actually fills a gap. (See *Wollmer v. City of Berkeley* (2011) 193

---

16      We note the Commission certified the Amendment following changes recommended by Commission staff, impliedly determining it could do so. Its brief contends that the regulations "allow a port to amend its proposed plan after submission . . . ." This view is entitled to deference. (See *Ross*, *supra*, 199 Cal.App.4th at p. 922 ["Although the courts have final responsibility for interpreting a statute, an agency's interpretation of its governing statutes is entitled to great weight"]; *id.* at p. 938 ["Courts must defer to an administrative agency's interpretation of a statute or regulation involving its area of expertise unless the challenged construction contradicts the clear language and purpose of the interpreted provision."].)

31

Cal.App.4th 1329, 1349 [courts must "construe the language of statutes and regulation in context, and must harmonize our laws" to extent possible]; *Barnhart v. Cabrillo Community College* (1999) 76 Cal.App.4th 818, 827 [rejecting assumption that statute and regulation were inconsistent, where they could "easily be harmonized"]; cf. *Save Our Heritage Organisation v. City of San Diego* (2018) 28 Cal.App.5th 656, 667 [although CEQA did "not expressly authorize" addendum process in the guideline, it "fill[ed] a gap in CEQA"].)

In arguing for a different result, Navy Broadway makes two related arguments. It first contends the regulation "cannot be squared" with public participation requirements in the statute. But by focusing on both materiality and opportunity for public comment, and requiring further review only for significant nonpublic changes, the regulation ensures *meaningful* participation. (See e.g., Pub. Resources Code, § 30006 [the public "has a right to fully participate in decisions affecting coastal planning, conservation, and development"]; cf. *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1132 [codification of CEQA requirement that "significant new information" required EIR recirculation reflected legislative intent to "reaffirm the goal of meaningful public participation," not "to promote endless rounds of revision and recirculation of EIR's"].) Navy Broadway also alleges a conflict between the regulation and Public Resources Code section 30712's requirement that amendments be adopted by the Port's governing body. The Port board did adopt the Amendment. If Navy Broadway believes section 30712 *also* requires the board to approve postsubmission modifications, it provides no support for this view.

32

Third, Navy Broadway does not establish that the Commission violated regulation section 13634. It argues the executive director was required to make findings on materiality and public review before the Commission voted at the hearing, and failed to do so. But Navy Broadway identifies nothing in the regulation requiring formal or express findings. (Compare Cal. Code Regs., tit. 14, § 13632, subd. (a) [executive director "shall make a written recommendation" on whether amendment should be certified]; cf. *Benson v. California Coastal Com.* (2006) 139 Cal.App.4th 348, 354 (*Benson*) [addressing regulation § 13115, subd. (a), concerning permit appeals; "[n]o particular formality" was needed for required recommendation by executive director].) The director, Lester, participated in the hearing and expressed no concerns when the matter proceeded to a vote. His acquiescence amounts to an implied finding that the changes to the Amendment were not material, were subject to public review, or both. This implied finding is consistent with the Commission's subsequent finding that the changes were not material and/or public.

Although Navy Broadway contends generally that the Amendment changes were significant (and that Commission staff and Port board member Moore viewed them as such), it does not argue there was an absence of substantial evidence for the findings on nonmateriality and public review. It likewise fails to set forth all pertinent evidence on these matters. It thus waives any such argument. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived."]; *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 (*Foreman*)

33

[appellant arguing a lack of substantial evidence is "required to set forth in their brief *all* the material evidence . . . . Unless this is done the error is deemed to be waived."].) We note that the only changes even potentially at issue were those agreed to at the hearing, namely the rooftop utilization reports language and $500,000 allocation by the City. Regardless of how the revisions were negotiated, there was opportunity for public participation up until that point. The Commission staff reports addressed the Amendment and the changes to it. Members of the public provided input, as Navy Broadway and numerous others did. Even assuming the public should have been able to respond after the Port agreed to the changes at the hearing, Navy Broadway would still have to establish that those changes were material. It does not do so.

Finally, to the extent the Commission made procedural errors, they do not require reversal because Navy Broadway did not establish prejudice. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 801–802 [civil error requires prejudice for reversal]; see *North Pacifica LLC v. California Coastal Com.* (2008) 166 Cal.App.4th 1416, 1435–1436 [showing of prejudice required for regulation notice requirements]; *Benson*, *supra*,139 Cal.App.4th at pp. 355–356 [accord].)

On reply, Navy Broadway argues it "claimed throughout this proceeding that amendments to the port master plan injured [it] and the public by failing to provide adequate public review."[17] This untimely argument also lacks merit. Navy Broadway

_____

17    Navy Broadway raises a number of points only on reply, which we could deem waived. (*American Drug Stores*, *Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453 (*Stroh*)

34

does not dispute that it was able to address the Amendment and revisions up until the hearing. It is true that Navy Broadway could not respond to the changes made *at* the hearing. But it does not explain its objection to those particular changes (if any), or how presenting those objections could have impacted the Commission's decision. (See *Benson*, *supra*, 139 Cal.App.4th at pp. 355–356 [allegedly inadequate written notice not due process violation; appellant could not "show prejudice on the assumption" that he "would have been able to convince" the Commission of his position]; cf. *Rominger v. County of Colusa* (2014) 229 Cal.App.4th 690, 711–712 [prejudice not presumed under CEQA; plaintiffs failed to show how notice defects "deprived any affected persons the realistic opportunity to protect their interests" or "precluded informed decisionmaking and informed public participation"].)[18]

2.     *Appealability of the Convention Center Expansion*

Navy Broadway contends the Commission erred by concluding the Convention Center expansion was not appealable, and not subject to Chapter 3. We disagree.

---

["[p]oints raised for the first time in a reply brief will ordinarily not be considered"].) We exercise our discretion to discuss certain of them.

[18]     Defendants also contend the changes were not material for other reasons, including that Navy Broadway forfeited its regulation section 13634 arguments by not raising them before the Commission (and they were untimely, given the regulation's adoption date), and that the Port conducted public, postcertification proceedings under section 13632, subdivision (e). Because we conclude that Navy Broadway did not establish reversible error based on regulation section 13634, we do not address these issues.

35

a.     *Additional Facts*

The Commission addressed the Coastal Act chapters applicable to its review.  It correctly stated that it must certify an amendment that is consistent with Chapter 8 and, for a development that is appealable under section 30715, Chapter 3 as well.  It determined the Hotel expansion was appealable, and thus had to be consistent with both Chapters 3 and 8.  As for the Convention Center, it found the expansion nonappealable, explaining in part:

> "While the Convention Center Expansion contains visitor serving uses, such as a minor retail component, art galleries or museum use, this is an ancillary and incidental use to convention operations. Thus, Chapter 8 is the standard of review for this portion of the project."

The Commission elsewhere stated that the expansion would be 740,000 square feet, and that there would be 15,000 square feet of visitor-serving uses, including retail.

b.     *Applicable Law*

Appealability is governed by section 30715.  After a port master plan or amendment is certified, permit authority over new development is delegated to the port governing body, "except that approvals of any of the following categories of development . . . may be appealed to the commission."  (§ 30715.)  Identified categories include: "Office and residential buildings not principally devoted to the administration of activities within the port; hotels, motels, and shopping facilities not principally devoted to the sale of commercial goods utilized for water-oriented purposes; commercial fishing

36

facilities; and recreational small craft marina related facilities."  (§ 30715, subd.

(a)(4).)[19]

c.    *Analysis*

Navy Broadway relies on the fact that the Convention Center expansion concededly included some retail "shopping facilities" and argues that "nothing in the Coastal Act exempts 'ancillary and incidental' uses from being appealed . . . ." Defendants maintain the Commission properly interpreted section 30715, subdivision (a)(4) as "not applying to small-scale uses that are ancillary and incidental to a non-appealable development such as the Convention Center," and urge us to defer to its interpretation.  They explain that the Amendment "designates the land to be occupied by the Convention Center expansion as 'Commercial Recreation' " and argue that only 15,000 square feet, or "1.5 percent," of the expansion "might include some retail use."

We conclude that the Commission's interpretation is consistent with section 30715 and warrants deference.  (See *Ross*, *supra*, 199 Cal.App.4th at p. 922.)  Section 30715 addresses *developments* that fall into particular categories, not portions of such developments.  The Commission could reasonably determine that the development consisting of the Convention Center expansion was not appealable, notwithstanding its incorporation of ancillary retail facilities that might be appealable in isolation.  Although

---

[19]    Other categories are developments for storing gas and oil; waste water treatment facilities; roads or highways "not principally for internal circulation within the port boundaries"; oil refineries; and petrochemical production plants.  (§ 30715, subd. (a).)

37

there could arguably be close questions (e.g., where it is unclear whether a component is ancillary), this record did not present one. At most, the retail component would be a very small part of the large Convention Center expansion.[20]

Navy Broadway appears to assume that section 30715 requires the Commission to focus on portions of developments in assessing appealability. It is this assumption that permits Navy Broadway to contend that an ancillary component can render an entire development appealable. But it identifies nothing in the statute to support this approach.

None of Navy Broadway's other contentions compel a different result. First, it offers other arguments for why the Convention Center expansion is appealable. It contends the expansion is in an area designated by the Port for commercial recreation, where developments include hotels, shopping and the convention center. If Navy Broadway is suggesting that a development in a commercial recreation area is necessarily appealable, we disagree. Section 30715 identifies categories of appealable developments by function, not location. Navy Broadway also contends "[t]here is nothing water-oriented about a convention center or its 'ancillary and incidental' retail operations." The phrase "water-oriented" is in the shopping facilities provision. A development would have to be a shopping facility—which the Convention Center expansion is not—before its relatedness to water is relevant.

---

[20]     Although the precise square footage of the expansion is unclear (as discussed *ante*), there can be no real dispute that the planned 15,000 square feet in retail facilities is minimal by comparison.

Second, Navy Broadway questions the Commission's findings. For example, it mistakenly contends the retail facilities were 45,000—not 15,000—square feet. But the 45,000 figure was in the original Amendment, and it was 15,000 in the certified version (with both referring to all visitor-serving uses, not just retail). Either way, retail would only be a minor part.

Navy Broadway also contends the Commission did not consider that retail was 1.5 percent of the Convention Center expansion. Yet the Commission addressed both the size of the total expansion and of the visitor-serving uses, so we can reasonably infer it was aware the latter was very small in relation to the former. Navy Broadway additionally emphasizes the significance of the retail facilities, arguing that they "are the primary means to activate what little of the waterfront will remain after expansion . . . ." The issue is whether the retail facilities were incidental to the Convention Center expansion, not their relationship to the waterfront. And the EIR states that "it is reasonable to assume most of the [retail] patrons would be [Convention Center] attendees."

In a related argument raised on reply, Navy Broadway contends that we should not defer to the Commission because Commission staff argued in a 2013 matter involving restaurant permits that "shopping" includes "restaurants." A staff report is not dispositive. (See *Benson*, *supra*, 139 Cal.App.4th at p. 354 [staff recommendation "was not binding on the Commission"].) We also do not see how the cited report would contradict the Commission's position here. If a development is limited to a restaurant or

39

retail store, the Commission could reasonably conclude it is appealable. But the development here was the Convention Center expansion.[21]

3.      *Findings Under The Coastal Act*

In various ways Navy Broadway attacks the Commission's findings on consistency with the Coastal Act. We conclude, however, that it has not established the Commission failed to make any required findings, or that there is insufficient evidence for the findings it did make.

a.      *Additional facts*

The Commission's findings provided its reasoning for certifying the Amendment. The Commission concluded:

> "As a result of the various revisions to the proposed [Amendment], the impacts to public access and recreation will be significantly reduced. Although the proposed expansion will substantially alter the nature of public views and public access, the new project features, including the roof-top public park, the pedestrian-oriented improvements to Park Boulevard and Convention Way, and the 500 new hotel rooms, will create additional opportunities for the public to access and enjoy the shoreline. As proposed, the [Amendment] would authorize development that has been located, designed, and constructed so as to provide for beneficial uses to public recreation, public access, and visual quality, and to minimize environmental impacts, including protecting views to and along the bayfront. Therefore, the amendment is consistent with the Chapter 3 and Chapter 8 policies of the Coastal Act."

---

[21]    Navy Broadway raises other points on reply, including criticizing the Port for identifying the Convention Center expansion as nonappealable in materials accompanying the Amendment and contending the Commission did not raise its arguments below. Even if we reached these points, they lack merit. It is the Commission's decision that is at issue, not the Port's. And the Commission did take the same position in the trial court, without citing the 1.5 percent figure.

b.      *Chapter 3 Findings*

i.      *Overview*

Navy Broadway contends the Commission failed to mention certain Chapter 3 policies (i.e., as set forth in particular statutory sections); quoted but did not make findings under others; and lacked substantial evidence for findings it did make or supposedly failed to make.[22]  In our view, however, Navy Broadway does not establish any deficiency in the Commission's findings under Chapter 3.

First, Navy Broadway focuses in large part on the Convention Center expansion. As we have already discussed, the Commission reasonably concluded that the Convention Center expansion was not an appealable development—meaning it was not covered by Chapter 3—and the Commission accordingly could not have erred by failing to make Chapter 3 findings regarding it.

Second, to the extent the Commission did address Chapter 3, its findings were adequate.  Administrative findings "need not be as precise or formal as would be required of a court."  (*McMillan v. American General Finance Corp.* (1976) 60 Cal.App.3d 175, 183.)  In particular, the Commission was not required to provide an explicit written finding on each statutory section.  Its findings had to—and did—"bridge the analytic gap

_____

[22]     Specifically, Navy Broadway contends the Commission omitted sections 30212.5, 30250, and 30252; quoted but did not make findings under sections 30212, 30221, and 30251; and lacked substantial evidence for its findings under section 30220 and findings it failed to make under other sections.  We organize our discussion by issue (e.g. parking), and address multiple statutory sections together when appropriate.  We do not address compliance with section 30253, which Navy Broadway references only in its factual summary.

between the raw evidence and ultimate decision or order." (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515; *Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 513 [findings must disclose " ' "analytic route" ' "]; *City of Carmel-By-The-Sea v. Board of Supervisors* (1977) 71 Cal.App.3d 84, 91 [no merit in "contention that only written findings of fact, labeled as such" comply with *Topanga*]; *McMillan*, at p. 183 [available references can sometimes fill omissions].) We thus reject Navy Broadway's argument that the findings were deficient under *Topanga*.[23]

In the sections that follow, we address Navy Broadway's challenges regarding Commission findings under Chapter 3 (or the purported lack thereof), as well as substantial evidence arguments. Some issues overlap with matters we would otherwise reach under Chapter 8, and we elect to address the others.

ii.      *Proximity to Existing Development*

Section 30250 provides in pertinent part that "[n]ew . . . commercial . . . development . . . shall be located within, contiguous with, or in close proximity to, existing developed areas able to accommodate it or, where such areas are not able to accommodate it, in other areas with adequate public services and where it will not have significant adverse effects, either individually or cumulatively, on coastal resources . . . ." (§ 30250, subd. (a).)

---

23      *Spring Valley Lake Assn. v. City of Victorville* (2016) 248 Cal.App.4th 91, which Navy Broadway cites only on reply, is also inapposite. (*Id.* at pp. 95, 105–106 [city was required to make affirmative findings in approving project's parcel map, citing case law and an Attorney General opinion that such findings were necessary under Gov. Code, § 66474].)

Navy Broadway initially argued that the Commission failed to address section 30250. Defendants responded that because the Project involved an expansion of existing facilities, no further discussion was necessary. Navy Broadway argued on reply that section 30250 requires development to be located where it will not have significant adverse effects, suggesting a finding on the issue is needed, and that substantial evidence could not support such a finding due to air quality impacts. Even if we considered this argument, it does not compel reversal.

As an initial matter, Defendants and Navy Broadway interpret section 30250 differently. For Defendants, the statute seems to require *either* location within existing development *or* location in another area with adequate public services and no significant adverse effects. Navy Broadway appears to believe section 30250 requires location in an existing development or other area with adequate services *and* no significant adverse effects. Neither party offers any statutory analysis or case law, and there are cases reaching differing conclusions. (Compare, e.g., *Billings v. California Coastal Com.* (1980) 103 Cal.App.3d 729, 740–741 [§ 30250 "requires that a new development shall not be located in a previously undeveloped area unless there are adequate public services and the development 'will not have significant adverse effects' " (italics omitted)], with *Sierra Club v. Superior Court* (1985) 168 Cal.App.3d 1138, 1141 ["New development must not have significant adverse effects on coastal resources," citing § 30250.].) But the burden is on Navy Broadway to show error. It has not established that any failure by the Commission to address significant adverse effects under section 30250 would render its findings insufficient.

43

The findings the Commission did make, regarding existing development, are adequate. The Commission indicated that "[t]he site and the area surrounding the site are entirely developed with urban uses." It described the area, including the location of the Convention Center, and relative locations of the Hilton and Marriott hotels, other landmarks, access roads, and shoreline. These findings sufficiently explain that the Project was located within or near "existing developed areas." (§ 30250, subd. (a).) They are also supported by the EIR, which states that "there would only be changes to accommodate more of the same types of existing land uses . . . ."[24]

Finally, even if we were to reach significant adverse effects, Navy Broadway's substantial evidence argument here turns on air quality impacts. As we later discuss in connection with Chapter 8, the Commission did address air quality, and its findings are supported by the record.

### iii.    *Public Access*

Navy Broadway challenges the adequacy of the Commission's public access findings under section 30212, contending as well that there is insufficient evidence for a consistency finding. Section 30212 requires that new development projects provide "[p]ublic access from the nearest public roadway to the shoreline and along the coast," unless, among other things, "adequate access exists nearby." (§ 30212, subd. (a).) We

---

[24]    Navy Broadway argues the Project was "unequivocally a new development," and Defendants waived their argument regarding existing facilities by relying on a different theory below. The issue is not if the Project was new, but whether it was situated within a developed area, and Defendants did argue below that the Project was an expansion of the existing Convention Center.

44

believe the Commission adequately addressed public access, and that the record supports its findings.

Specifically citing section 30212, the Commission found that while the Amendment would change the nature of public access, it would not adversely impact it. The findings described existing routes to the Convention Center and bayfront; these included (1) vehicular access along Park Boulevard (becoming Convention Way/Marina Park Way behind the Convention Center), (2) pedestrian access via a bridge over Harbor Drive to Park Boulevard, and (3) a stairs and funicular at Harbor Drive to the top of the Convention Center stairs, with an elevator down to the ground level park and bayfront promenade. The Commission also explained how the Project would maintain or improve access. For example, a continuous public accessway would be created along the waterfront and connect to the Embarcadero Marina Park South; a public walkway would be constructed from the overpass at Harbor Drive through the hotel entry area and down a new stairway to the promenade ("greatly enhanc[ing]" direct public access to the waterfront); and crosswalks would connect the promenade to the visitor-serving uses on the Convention Center bayside façade. The Commission also noted the relocation of truck operations and pedestrian-focused improvements.

Navy Broadway criticizes the Commission for not addressing the adequacy of access and focusing on routes to the Convention Center and promenade (rather than from the public roadway to shoreline). Even if the statute requires new development to provide adequate access on site (and not simply nearby), there is nothing to suggest the Commission found public access less than adequate. As for the routes, the promenade is

45

next to the water, and the Commission adequately addressed routes from and between downtown, the Convention Center, and the shoreline.

There is substantial evidence to support the Commission's findings. The Amendment itself describes the changes. The record contains a Port briefing booklet with renderings illustrating access routes and areas, as well as other materials containing site plans and graphics. The public access program materials describe the access routes in detail. At the hearing, the Port also noted the pedestrian experience would be improved by the relocation of truck operations.

Navy Broadway cites current and historical Commission staff findings regarding a " 'walling off' " of the bay and Commission findings regarding access challenges in the area (such as the link between the Convention Center and the Gaslamp District). But our review is for substantial evidence. Neither staff comments, nor the Commission's acknowledgment of access challenges, establish a lack of support for a finding of consistency with public access requirements.

iv. *Recreation*

Navy Broadway argues there is no substantial evidence for the Commission's findings regarding recreation under sections 30220 and 30221. Section 30220 requires protection of "[c]oastal areas suited for water-oriented recreational activities that cannot readily be provided at inland water areas . . . ." Section 30221 affords similar protection to "[o]ceanfront land suitable for recreational use," unless recreational demand is "already adequately provided" in the area. The Commission addressed coastal recreation at length, and Navy Broadway does not establish a lack of support for its findings.

46

We begin with two threshold issues. Defendants argue Navy Broadway waived its arguments by failing to raise sections 30220 and 30221 before the Commission, citing CEQA authority. (*Citizens for Responsible Equitable Environmental Development v. City of San Diego* (2011) 196 Cal.App.4th 515, 527.) CEQA contains a statutory waiver provision (§ 21177, subd. (a)), Defendants do not identify a waiver provision under the Coastal Act, and Navy Broadway did object to the factual matters at issue (e.g., the rooftop park). The parties also dispute whether section 30221, which protects oceanfront land, is inapplicable because the Project is on the bay. Neither side provides authority, but we need not resolve the issue today. For even if section 30221 applies, which we assume for purposes of discussion, Navy Broadway would not prevail.

We turn to the Commission's findings regarding sections 30220 and 30221. While acknowledging the Amendment would have "some impacts" on coastal recreation, it determined that the "new project features . . . will create additional opportunities for the public to access and enjoy the shoreline." It also found the public access program would ensure that "recreational opportunities to replace the existing park and recreational uses between the Convention Center and the bay are provided."

The Commission provided additional and specific findings on these matters. It explained that although the Project would reduce the size of the landscaped area on Harbor Drive and the current waterfront park, the new rooftop park would result in

47

additional open space.[25]  It noted that the rooftop would also "add new recreational opportunities, similar to the High Line in New York and the Moscone Center and gardens in San Francisco."  The Commission identified improvements for pedestrians, including the bayside visitor-serving amenities.  It also identified new public spaces, including the 1,900 square foot public plaza and opened recreational pier at the foot of Park Boulevard (which would "creat[e] a waterfront destination").  Finally, the Commission described various measures to enhance public access, including the rooftop utilization reports.

Purporting to challenge the Commission's consistency determinations regarding recreation on substantial evidence grounds, Navy Broadway fails to address many of its findings or set forth all material evidence on recreation, and to that extent forfeits this argument.  (*Foreman*, *supra*, 3 Cal.3d 875, 881.)[26]  The arguments it does make do not support reversal.

First, Navy Broadway argues that the Project would eliminate, not reduce, ground level park space.  It also faults the Commission for failing to acknowledge the

---

25    The Commission's calculations are somewhat confusing, but the changes result in increased open space in any event.  The Commission indicated that open space on Harbor Drive would go from 1.6 acres to one acre, the waterfront park would go from 4.7 acres to 1.8 acres, and the rooftop park would add 5.2 acres, resulting in an increase of 1.7 acres.  But the Commission elsewhere states, and the record appears to reflect, the existing waterfront park was 5.4 acres.  Assuming that the reduction was still to 1.8 acres, this would mean an additional one acre of open space, not 1.7 acres.

26     On reply, Navy Broadway addresses its failure to set forth the evidence supporting the Commission's findings, generally, and states that "[i]n [its] view, no evidence - let alone substantial evidence" supports them.  Suffice it to say, this assertion does not establish a lack of substantial evidence.

48

"waterfront recreational opportunities . . . that will be lost," and notes "saltwater fishing cannot be done inland . . . ." And it cites input from Commission staff, including a Port e-mail indicating Commission staff expressed concern that adding to the Convention Center was a " '*lower priority* visitor-serving use' along the bayfront." None of this establishes a lack of support for the Commission's findings. The Commission correctly found that existing park space would be reduced, not removed. The record reflects that ground level park space would remain, including in the site plans incorporated into the Amendment and the Port agenda for the September 2012 approval hearing. As for fishing, Navy Broadway identifies no evidence of any impact on this activity. Even if the reduction in waterfront park space somehow affected fishing (notwithstanding that the promenade separates that space from the bay), there is a public fishing pier on the nearby Embarcadero Marina Park South. The Commission could determine that adequate fishing opportunities would remain. With respect to the purported Commission staff comments, they do not call into question the actual Commission findings. (*Benson*, *supra*, 139 Cal.App.4th at p. 354.)

Second, Navy Broadway also appears to assume that utilizing rooftop park space is necessarily harmful to public recreation (going so far as to say that calling it a benefit is "Orwellian"). But the Commission found it would provide recreational opportunities, and Navy Broadway identifies nothing to establish it will not be used for this purpose. Navy Broadway also cites nothing in the Coastal Act, or any other authority, prohibiting consideration of an elevated recreational development.

49

Third, Navy Broadway contends (primarily with respect to views, but also park space) that replacing or changing resources does not constitute "protection" under the Coastal Act. It elsewhere makes the related claim that section 30220 does not permit harms to be offset, in contrast to certain other Chapter 3 policies. The Commission did not find that recreation would be harmed. Rather, it found it would be impacted, but nonetheless remain adequate and, on balance, would be enhanced. Further, Navy Broadway provides no statutory analysis or authority for its interpretation of "protection," and sections 30220 and 30221 contemplate that recreational activities may be provided elsewhere. (See § 30220 [protecting "activities that cannot readily be provided at inland water areas"]; § 30221 [protection not required where demand is "already adequately provided for in the area"]; cf. *La Costa Beach Homeowners' Assn. v. California Coastal Com.* (2002) 101 Cal.App.4th 804, 815–816 ["Although the provisions of the Coastal Act establish the objective of maximizing public access to the beach, neither the act nor its associated administrative regulations specify how this objective is to be achieved."].) The Commission could reasonably conclude the coastal and waterfront protection policies were satisfied given that equivalent or enhanced recreational opportunities remained.

v.  *Parking*

Navy Broadway next contests the findings on parking and public transportation under sections 30252 and 30212.5. Subdivision (a) of section 30252 specifies that new development "must maintain and enhance public access to the coast" by, among other things, "providing adequate parking facilities or . . . substitute means of serving the

50

development with public transportation . . . ."  Section 30212.5 requires that when "appropriate and feasible," parking facilities "shall be distributed throughout an area" to mitigate the impacts of overcrowding and overuse.  The Commission's findings on these issues were adequate and supported by the record.

Although the Commission did not specifically cite sections 30252 and 30212.5, it still addressed parking capacity, parking distribution, and public transportation, and concluded the Project would "not adversely impact public access."  The findings note existing parking facilities for the Convention Center and Hilton, and the planned addition of 12 parking spots at the relocated water transit center.  It found the Parking Management Plan would distribute parking throughout the area, and the Convention Center and Hilton operators would be required to implement it.[27]  It also noted that the site was also well-served by the trolley, ferry, and the Port's summer bayfront shuttle program.  These findings were sufficient to address the statutory requirements, and reflect a determination that parking capacity and distribution were adequate.

Substantial evidence supports the Commission's findings.  The EIR described existing parking capacity in the Convention Center and hotel parking facilities, and noted the Convention Center structure had generally been sufficient.  It addressed the anticipated spaces needed for the Project based on the Port's Tidelands Parking Guidelines; explained that parking needs fluctuate throughout the day; and indicated that

---

[27]    The Commission refers to both a "Parking Management Plan" and "Parking Management Program."  The EIR primarily uses "Parking Management Plan," and we do the same.  Whatever its name, there was a parking plan.

51

events with projected demand exceeding the facilities' capacity (i.e. 13,800 attendees) could experience parking deficits.  In such cases, the Parking Management Plan would need to be implemented.  As summarized in the EIR, the plan would provide strategies that include coordinating with adjacent hotels, subsidizing transit fees, and using a "[j]oint event/transit ticketing program with MTS [(the Metropolitan Transit System)]." In responding to comments, the EIR noted that a new parking structure could lead to more congestion and greater environmental impacts.  The EIR also described alternative transportation, including public transit, private hotel shuttles and taxis, the ferry, and a planned summer bayside shuttle.

The Port's Coastal Consistency analysis noted parking spaces would not meet the Tidelines Parking Guidelines, but also indicated that the "two [parking] locations are spread over the Project site" and that the Parking Management Plan (and a related Event Transportation Plan) would designate parking arrangements to mitigate overcrowding and overuse.  Port staff also addressed transportation alternatives in a June 2013 letter to Commission staff.  At the October 2013 certification hearing, a speaker noted the large number of parking spaces in downtown San Diego, generally.

Navy Broadway points to the EIR, among other things, to contend there is no evidence of consistency.  The EIR did ultimately determine that significant and unavoidable impacts would remain after mitigation.  The Statement of Overriding Considerations indicated that "events with significant attendance over 13,800 attendees would encounter insufficient parking spaces."  The Coastal analysis also suggested inconsistency could remain after mitigation.

52

However, the Commission "has discretion to determine adequacy of parking for development in the coastal zone." (*Reddell v. California Coastal Com.* (2009) 180 Cal.App.4th 956, 969.) The evidence in the record includes the two existing parking facilities, the Parking Management Plan, and public transportation alternatives, and could also support a consistency finding. We will not reweigh the evidence. (See *Reddell*, at p. 968 [declining to reweigh evidence considered by Commission]; *Jeffery v. Salinas* (1965) 232 Cal.App.2d 29, 37–38 [city council determination that hotel parking was adequate was a binding factual determination].)

Finally, we reject Navy Broadway's claim that the Commission was "cherry-picking" from the EIR and Port analysis, and its suggestion that there was no plan for smaller, parking-dependent events. Reaching a different conclusion does not mean the Commission failed to fully consider the documents, and the EIR reflects parking is generally adequate for smaller events.

vi.     *Views*

Navy Broadway contends there is no substantial evidence to support the Commission's findings on views under section 30251. That section provides that "[t]he scenic and visual qualities of coastal areas shall be considered and protected as a resource of public importance." It further states that development shall be "be sited and designed to protect views to and along the ocean and scenic coastal areas." Navy Broadway does not establish a lack of record support for the Commission's consistency finding.

The Commission acknowledged several effects of the Project: the view corridor between the Convention Center and Hilton would be reduced; that corridor was "one of

53

few meaningful windows to the water"; and that moving the Convention Center so close to the water could result in it dominating the corridor.[28] However, it also found mitigation was provided by the Amendment revisions, including the "slight[] pulling back and angling [of] the . . . corner of the proposed expansion" to preserve water views and reconfiguration of park space and removal of landscape mounds to open up such views. It also found the rooftop park would "create new expansive views of the water," and the public access walkway and stairs in the Hilton expansion would aid views as well. The Commission concluded that "while the distance between the Hilton and the Convention Center will be reduced, overall, the enhancements . . . will preserve and enhance visual and public access to and along the waterfront, consistent with the Coastal Act." The Project features and revisions discussed by the Commission are in the Amendment, and other documents provided renderings of anticipated views.

Navy Broadway's arguments do not persuade us. First, it attempts to characterize certain Commission statements as admissions of inconsistency. It contends that even after the Amendment revisions, only " 'some views' were protected," citing the corner finding. But the Commission found that the corner revision would protect "some views," not that these were the only ones protected; others were preserved or enhanced in different ways. Navy Broadway also contends that the Commission admitted "there is currently almost no relationship between upland areas and the coast." (Italics omitted.)

---

28     The view corridor would contract from a range of between 370 and 550 feet, to a range of between 270 and 410 feet.

54

In making this statement the Commission was addressing the Fourth Avenue pedestrian bridge (see discussion *post*), not views; in any event, this would not undermine the other view findings.

Second, Navy Broadway disagrees that the revisions and rooftop park mitigate impacts to views. It argues that "at best it shows that scenic and visual qualities are being replaced," and that "[e]liminating existing coastal views and replacing them with manufactured views" is not protection. In so contending, Navy Broadway again assumes that the rooftop park is necessarily inferior to the ground level space and that providing equivalent resources cannot constitute protection. We again reject these contentions.

Finally, on reply, Navy Broadway disputes that removal of the corner and landscape mounds will preserve and open up views, citing the renderings. In this sense, however, Navy Broadway is not contesting there is evidence that the Project will in some respects improve views; it just disagrees with the Commission's finding that these mitigation measures are adequate. This is not grounds for reversal.

c.      *Chapter 8 Finding*

The parties agree that Chapter 8 applies to the entire Project. Section 30708, part of Chapter 8, provides in part that "[a]ll port-related developments shall be located, designed, and constructed so as to: [¶] (a) Minimize substantial adverse environmental impacts." (§ 30708, subd. (a).) Navy Broadway contends there is no evidence to support

a finding of consistency with section 30708, focusing on parking, views, and air quality.[29]

We addressed parking and views in connection with Chapter 3, explaining that (1) the Commission found the Amendment would provide for adequate, distributed parking and protect and enhance views; and (2) Navy Broadway did not establish a lack of substantial evidence for these findings. For similar reasons, Navy Broadway does not establish a lack of substantial evidence that parking and views were consistent with section 30708.[30]

We now turn to air quality. The Commission found that the Amendment would "ensure consistency with San Diego Air Pollution Control District's [(Air District)] requirements upon amendment of the Air District's growth projections to reflect the

_____

[29] On reply, Navy Broadway indicates that the Commission findings list numerous other significant adverse environmental impacts, but does not elaborate on this point. To the extent it seeks to establish a lack of evidence as to section 30708 based on other issues, the argument comes too late and without support.

[30] Defendants argue that parking is not even an impact here; Navy Broadway disagrees. (Compare *San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 697 ["social inconvenience" of parking not an environmental impact], with *Taxpayers for Accountable School Bond Spending v. San Diego Unified School Dist.* (2013) 215 Cal.App.4th 1013, 1051 [parking should be studied for impact].) Defendants contend section 21099, which became effective in 2014, supports their view. (Stats. 2013, ch. 386, § 5; § 21099, subd. (d)(1) [parking not an impact for "residential, mixed-use residential, or employment center project on an infill site within a transit priority area"]; *Covina Residents for Responsible Development v. City of Covina* (2018) 21 Cal.App.5th 712, 728 [through § 21099, Legislature endorsed *San Franciscans* approach].) Because there is substantial evidence for the Commission's findings on parking, we need not at this juncture resolve the scope of section 21099.

increased growth anticipated in the Port Master Plan area." Substantial evidence supports this finding.

The EIR described the role of the Air District and its air quality plans. The Air District has "primary responsibility" for "rules and regulations designed to attain" state and national air quality standards. The Regional Air Quality Strategy (RAQS) and the San Diego portion of the State Implementation Plan (SIP) "provide the region's documentation for improving air quality . . . ." Both are updated on a triennial basis. (*Ibid*.) Emission and growth projections are based in part on land use plans, and development consistent with the growth anticipated in such plans is also consistent with the RAQS and SIP.[31] The EIR explained that, because the Project would result in greater density than the Port Master Plan, it would be inconsistent with the RAQS and SIP until they were updated. The proposed mitigation required the Port and City to request that the Air District amend growth assumptions to incorporate the Project prior to the next triennial review.

The EIR found that effects would still be significant and unavoidable after mitigation. The Statement of Overriding Considerations suggested that air quality could

---

[31]    We note this description appears consistent with applicable law. (See Health & Saf. Code, § 40925, subd. (a) [every three years, district shall revise plans to attain state air quality standards to, among other things, incorporate projected emissions growth]; *Assoc. of Irritated Residents v. United States EPA* (2012) 686 F.3d 668, 676 [federal Clean Air Act "requires states with nonattainment areas to update their SIPs every three years"]; cf. Pub. Resources Code, § 30253 [Chapter 3 provision addressing minimization of adverse impacts]; *id.*, subd. (c) [new development shall "[b]e consistent with requirements imposed by an [air district] or the State Air Resources Board as to each particular development"].)

be mitigated to a level below significance if the Project was incorporated into growth assumptions before the next triennial review—but that the review "may not occur" prior to Project construction. The Port's Coastal Consistency analysis found that the Project would be inconsistent with the RAQS and SIP until they were revised in the next review.

As reflected in the EIR and Port analysis, there was a plan to ensure air quality consistent with the Air District's existing review obligations, notwithstanding questions about when it would occur. The Commission could reasonably find that the Air District *would* comply with its duties and account for Project impacts in its next review cycle, thus minimizing any substantial adverse environmental impact. (*McAllister*, *supra*, 169 Cal.App.4th at p. 931 [absent contrary evidence, "we presume that an agency carries out its official obligations," citing Evid. Code, § 664].)

Navy Broadway argues that "nothing in the Coastal Act authorizes the Commission to approve polluting development and uses just because another regulatory agency has jurisdiction over pollution." The Commission neither allowed polluting development, nor let the Air District decide whether to do so. Rather, it determined that the Air District's review process would account for emissions increases from the Project. Navy Broadway also focuses on the inconsistency findings in the EIR and Port analysis. But, again, there is no dispute there was mitigation in place for air quality. Doubts about

timing amount to a difference of opinion, not a lack of evidence for the Commission's findings.[32]

### 4. *Findings Regarding CEQA*

Finally, Navy Broadway argues that the Commission's certification violated CEQA because it made insufficient findings on mitigation and no substantial evidence supported its finding that the new pedestrian bridge was infeasible.

#### a. *Additional facts*

The Commission addressed both CEQA generally, and the pedestrian bridge specifically. With respect to CEQA, it found in pertinent part:

> "The Port of San Diego is the lead agency and the Commission is a responsible agency for purposes of CEQA. In the final EIR the Port identified that even after adopting all feasible mitigation measures, there would be significant unavoidable environmental impacts . . . . The Port determined that specific economic, social, and other benefits of the proposed project outweigh the project's unavoidable adverse environmental effects. . . . [¶] As described above, the Commission has found that the [Amendment] can be found in conformance with Chapter 3 and Chapter 8 policies of the Coastal Act. The amendment as modified by the Port will not cause significant adverse impacts to the environment of the coastal zone . . . . The Port incorporated feasible mitigation measures to minimize adverse impacts on recreation and visual quality. There are no other feasible alternatives or feasible mitigation measures available as described above which would substantially lessen any significant adverse effect which the amendment may have on the

---

[32]    On reply, Navy Broadway argues that a lead agency may disclaim responsibility to mitigate environmental impacts "only when the other agency . . . has *exclusive* responsibility," quoting *City of Marina v. Board of Trustees of the Cal. State Univ.* (2006) 39 Cal.4th 341, 366, italics omitted. Even if we considered this argument, the Commission was not the lead agency (see *post*) and, regardless, did address how mitigation would occur (i.e., through Air District review).

environment. Therefore, the Commission finds that the [Amendment] is consistent with [CEQA]."

The findings regarding the bridge were as follows:

"[T]here is currently almost no relationship between upland areas and the coast. A pedestrian bridge at 4th Avenue could potentially improve the connection between the busy downtown area and the shoreline that was essentially eliminated by the first [Convention Center] expansion. . . . [¶] However, the Port has indicated that there are currently no funds available to construct a bridge at 4th Avenue. Preliminary estimates from the Port suggested that the cost . . . would be in the vicinity of $42 million dollars. This initial estimate may not ultimately be accurate; the cost of the existing pedestrian bridge . . . was originally projected to be $12.8 million dollars, and was ultimately constructed for $26.8 million dollars. That bridge design is unusual . . . , and it's unclear why a second pedestrian bridge would necessarily be so much more costly. Nevertheless, the Port maintains that construction . . . is financially infeasible at this time. The Port also maintains that the bridge is infeasible because portions of the bridge would be outside of both the Port's jurisdiction and the coastal zone and in the City of San Diego's jurisdiction . . . . As such, the Port could not guarantee that the portion outside its jurisdiction would be constructed."

The Commission confirmed that sufficient access would still exist: "[W]hile construction of a bridge at 4th Avenue would have provided an additional access point to the rooftop park, with the multiple other access points provided and the improved wayfinding measures required in the [Amendment], the Commission can be assured that sufficient access to the shoreline will be provided."

b.     *Adequacy of Findings*

Navy Broadway contends that the Commission was required to find that

60

there were "no more feasible mitigation measures to reduce the expansion's environmental impacts to a level of insignificance," and failed to do so. To the contrary, we believe the Commission's findings were sufficient.

The Coastal Act regulations required the Commission to "make any findings required pursuant" to CEQA, in approving the Amendment. (Cal. Code Regs., tit. 14, § 13632, subd. (d).) CEQA section 21081 provides that no agency "shall approve . . . a project for which an [EIR] . . . identifies one or more significant effects on the environment" unless it makes certain findings. (Pub. Resources Code, § 21081.) Possible findings include that required project changes "mitigate or avoid the significant effects on the environment"; the changes are within another agency's jurisdiction; or that economic or other considerations "make infeasible the mitigation measures . . . in the [EIR]" and that benefits outweigh the effects. (*Id.*, subds. (a)(1), (3), (b); CEQA Guidelines, § 15091, subd. (a)(1), (3) [accord].) "CEQA does not require the responsible agency to consider the feasibility of environmentally superior project alternatives identified in the EIR if described mitigation measures will reduce environmental impacts to acceptable levels." (*Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351, 379 (*Rio Vista*).) The adequacy of the EIR itself is not at issue here, as Navy Broadway filed no timely action challenging it. (§ 21167.3, subd. (a).)[33]

---

[33] All parties besides the Commission cite regulation section 13632, subdivision (d), and CEQA section 21081. The Commission takes a different approach, describing its duties as a CEQA responsible agency (while also noting regulation § 13632, subd. (d).) The responsible agency duties regarding mitigation do not differ materially from those

Although the Commission found that the Amendment would not cause significant adverse impacts, it acknowledged that the EIR indicated there would be significant and unavoidable impacts. It proceeded to address mitigation, explaining that the Port "incorporated feasible mitigation measures to minimize adverse impacts" and there were "no other . . . feasible mitigation measures . . . which would substantially lessen any significant adverse effect." It also addressed measures to protect resources and limit impacts in its Coastal Act findings. The Commission's findings were sufficient for purposes of CEQA section 21081, and thus for regulation section 13632.

We reject Navy Broadway's contention that the Commission's findings were deficient because it failed to address whether "no more feasible mitigation measures" existed. Navy Broadway does not provide a statutory or other source for this language, and regardless, the Commission did find there were no other feasible mitigation measures.

Nor is Navy Broadway correct in arguing that findings on mitigation to a "level of insignificance" are required. CEQA focuses on substantial reduction, not insignificance, and contemplates that projects with significant effects can sometimes be approved. (See *San Franciscans for Reasonable Growth v. City and County of San Francisco* (1989) 209

under CEQA section 21081 and do not require separate analysis. (See CEQA Guidelines, § 15096, subd. (g)(2) [when EIR has been prepared, responsible agency shall not approve if it "finds any . . . feasible mitigation measures within its powers that would substantially lessen or avoid any significant effect the project would have on the environment"].) Navy Broadway also suggests the Commission was required to make separate findings under CEQA Guidelines section 15093, subdivision (b). This provision addresses when the *lead* agency is required to prepare a statement of overriding considerations.

Cal.App.3d 1502, 1519 ["[T]he Commission's duty to condition project approval on incorporation of feasible mitigation measures only exists when such measures would 'substantially lessen' a significant environmental effect."]; *Gilroy Citizens for Responsible Planning v. City of Gilroy* (2006) 140 Cal.App.4th 911, 935 [air pollution was significant and unavoidable, and project was approved with Statement of Overriding Considerations; "[n]o feasible mitigation measures that would substantially lessen or avoid environmental impacts had been proposed beyond those recommended in the EIR, all of which were adopted"].)  The regulation cited by Navy Broadway here applies to mitigation findings in the EIR itself, and is inapposite.  (See CEQA Guidelines, § 15126.4(a)(3).)[34]

c.    *Pedestrian Bridge*

Finally, Navy Broadway challenges the Commission's finding that the proposed Fourth Avenue pedestrian bridge was not feasible as a mitigation measure to enhance access.  We conclude, to the contrary, that the finding is supported by substantial evidence.

As an initial matter, Navy Broadway does not establish this particular finding was required.  An agency is not required to explain why a specific measure is infeasible when,

_____

[34]    An additional point warrants brief mention.  Navy Broadway suggests in its CEQA discussion that the contiguous nature of the expansion led to the impacts that required mitigation findings, and elsewhere indicates the Commission staff questioned the need for a contiguous expansion.  But staff findings are not binding (*Benson*, *supra*, 139 Cal.App.4th at p. 354), and Navy Broadway does not argue that the contiguous expansion itself supports error under CEQA.  According to the Commission, the Port maintained that contiguity was needed and that noncontiguous sites had been found to be infeasible.

as here, it has found other measures effective. (See *Rio Vista*, *supra*, 5 Cal.App.4th at p. 379; cf. *Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 244–245 ["Nothing in CEQA requires an EIR to explain why certain mitigation measures are infeasible."].) We also reject Navy Broadway's contention that "the Commission continued to believe that such a bridge was necessary to mitigate the serious harm to public access and recreational opportunities . . . ." The Commission acknowledged the bridge would have provided an "additional access point," but concluded there was sufficient public access without it. As we have already explained (*ante*, at pp. 44-46), there is substantial evidence of adequate public access.

To the extent a feasibility finding was required, the record supports a conclusion that the proposed pedestrian bridge was both economically and jurisdictionally infeasible. We start by addressing the cost issue. The Commission credited the Port's explanation that the bridge would cost approximately $42 million dollars and no such funds were available. A report on the Project indicated the construction estimate for the bridge was approximately $41.9 million as of July 2009, based on certain component costs. In an e-mail to Commission staff member Lilly, Port staff member Nishihira included the estimate and explained why the number was not feasible:

> "It is important to note that a new bridge over Harbor Drive would involve a completely different design and would be longer and higher than the existing pedestrian bridge. Also, my understanding of the $41.9 million figure, is that it is a prudent estimate which assumes the high-end of a range. This is to account for increasing construction costs and inflation. Regardless of what a refined estimate may conclude if/when one is done, any cost for the bridge - whether it ranges from $30 million to 550 million - exceeds the

64

> maximum project budget of $550 million dollars and presents a
> serious funding and construction challenge."

Finding the Port's representations credible, the Commission could reasonably conclude that the pedestrian bridge was economically infeasible.

Navy Broadway's arguments to the contrary are not persuasive. First, it questions the cost of the bridge, describing the Port's e-mail as "cursory" in "providing a terse five-line estimate that was more than four years old." It contends the "Commission was skeptical" of the estimate, citing the Commission's comment that it was unclear why a second pedestrian bridge would be more costly. And it contends "there was no reason to believe that the 4th Avenue bridge would cost much more, if at all more, than the unique bridge that had recently cost just $26.8 million." All of this amounts to a request that we reweigh the evidence, which is not our function. Questions about cost estimates are not a proper basis to overturn Commission findings otherwise supported by substantial evidence.

Navy Broadway also accuses the Port of "falsely stat[ing] [that] the budget for the Phase III expansion was only $550 million," explaining the "City had authorized bonds up to $575 million" and "had $25 million more to spend . . . than the Port had represented . . . ." To support this contention it relies on *Shapiro*, *supra*, 228 Cal.App.4th 756, but its reliance is misplaced. In *Shapiro*, this court addressed a challenge to a 2012 voter-approved special tax, the proceeds from which would be used to repay $575 million in municipal bonds issued to finance the Convention Center expansion and related expenditures. (*Id.* at p. 764.) The opinion did not address the expansion budget; we

65

ultimately concluded that the special tax was invalid. (*Id.* at p. 793.) Further, Navy Broadway does not explain why the total amount of bonds issued would have been synonymous with the project budget—much less cite anything in the record reflecting that the budget increased, or was anticipated to increase, because of it.[35]

Second, Navy Broadway contends that the Commission made "no effort" to ascertain the bridge's actual cost or the Convention Center expansion budget. It explains that the record lacks evidence "about how a reasonably prudent developer . . . would view the additional costs of a bridge," citing *Uphold Our Heritage v. Town of Woodside* (2007) 147 Cal.App.4th 587, 598 and *Save Round Valley Alliance v. County of Inyo* (2007) 157 Cal.App.4th 1437, 1461. But these authorities concern the feasibility of project alternatives, not mitigation, and are inapposite. (See *Cherry Valley*, *supra*, 190 Cal.App.4th at p. 352 [rejecting plaintiffs' reliance on *Round Valley* in the mitigation context, because "the case considered the feasibility of a specific project alternative, not an assortment of mitigation measures"].) And even in the context of project alternatives, no particular evidence is required. (See *Sustainability*, *Parks*, *Recycling & Wildlife Legal Defense Fund v. San Francisco Bay Conservation & Development Com.* (2014) 226 Cal.App.4th 905, 918 ["*Woodside* does not require any particular economic analysis or

---

[35]     Based on its belief that the bridge should have cost $26 million, and the budget was really $575 million, Navy Broadway argues there is "nothing in the record . . . . substantiating . . . that a $16.9 million shortfall . . . renders the development infeasible." There is nothing in the record on a $16.9 million shortfall, because that number is the product of Navy Broadway's speculation.

any particular kind of economic data, but requires generally 'some context' that allows for economic comparison."].)

The issue here, in contrast, is the economic feasibility of a mitigation measure. Navy Broadway provides no authority that any particular analysis or evidence is required. (Cf. *Cherry Valley*, *supra*, 190 Cal.App.4th at p. 352 ["[T]he relevant inquiry concerning the economic feasibility of mitigation measures is not, as plaintiffs argue, whether the anticipated net profits from the project were sufficient to fund them. Rather, the relevant inquiry is whether such measures were *themselves* feasible."].)

Finally, we turn to the jurisdiction issue. The Commission found that the bridge was infeasible not merely because it cost too much, but also because the Port could not guarantee that portions outside of its jurisdiction would be constructed. Navy Broadway does not disagree that part of the bridge would lie outside Port jurisdiction. Rather, it asserts without elaboration that "the Port admitted that those portions were within the City's jurisdiction." To the extent Navy Broadway is suggesting the City would agree to build the bridge, thus obviating jurisdictional issues, it declines to provide any evidence to support this contention, and we decline to consider it. Navy Broadway does not establish a lack of support for the Commission's finding that the jurisdiction issue contributed to infeasibility.

Thus, even if Navy Broadway's challenge were not untimely, we conclude it would fail on the merits, and we would affirm the judgment on this basis as well.

67

DISPOSITION

The judgment is affirmed. Defendants shall recover their costs on appeal.


DATO, J.

WE CONCUR:


BENKE, Acting P. J.


HUFFMAN, J.